### No. 10,880.

#### SUCCESSION OF FRANK BORGE.

1. A mandatary who has acted as such continuously for a long period of years without being called upon for an account, and who then renders an account showing a balance in his favor, does not subject his demand to a charge of staleness, because the credits giving rise to the balance arose in the first years of the mandate.

2. Presumptions of fact are not, like presumptions of law, governed by fixed rules. They are mere inferences, drawn by the judicial mind from the facts and circumstances of each particular case, dependent on their own natural efficacy in generating belief or conviction. Slight variations in the facts of any particular case alter the force of such presumptions, and all the facts must be considered together in determining their application.

3. The facts of this case are anomalous and peculiar, and considering them all together, the presumptions invoked do not suffice to destroy the positive evidence to the contrary, or to justify the reversal of the judgment appealed from; which, however, is amended by reduction of amount.

APPEAL from the Civil District Court for the Parish of Orleans. *King, J.*

*F. Michinard* and *J. P. Blair* for Plaintiff and Appellant:

1. "A stale claim long withheld from prosecution or presentation until he against whom it is preferred has died, must be established with more than reasonable certainty. An unfavorable presumption is created by delay. It can be removed only by peculiarly strong and exceptionally conclusive testimony." Wood vs. Egan, 39 An. 684. See also Succession of Henderson, 41 An. 489; Bodenheimer vs. Executors of Bodenheimer, 35 An: 1005; and authorities cited in the foregoing cases.

   This presumption operates, not merely against the fact that the debt ever existed, but rather against its continued existence at the time of the tardy demand for its payment.

2. "The testimony of plaintiff, in his own favor, to establish a large claim against a succession, should be received with greatest caution. It is, in itself, of the weakest character, and unless strongly corroborated can not serve as a basis of recovery." (Syl.) Cutler vs. Collins, 37 An. 95.

   "There may be such inherent probability in the statement of a witness as to induce the court or jury to disregard his evidence, even in the absence of any direct conflicting testimony." Quock Ting vs. United States, 140 U. S., p. 420.

3. "Extra-judicial admissions of a dead man are the weakest of all evidence, since they can not be contradicted, and no fear of detection in false swearing impends over the witness." Bodenheimer vs. Executors of Bodenheimer, 35 An. 1005.

4. The stale and suspicious claim sued on is one of the worst of its kind:

   (a) It is most stale, a part of it arising fifteen, and the most recent five, years prior to Borge's death. It was never mentioned during his lifetime.

   (b) No sufficient or even plausible explanation of the claimant's failure to collect, and of the long delay in presenting, his claim has been given.

   (c) Borge, the alleged debtor, was solvent and able to pay, and in the habit of promptly paying his employés. The claimant had no other means of support than his salary, and could not have supported himself and his family upon the amounts he says he received each year.

   (d) Claimant's conduct after Borge's death strengthens the presumption against him. He did not mention his claim when the account of the succession's creditors was filed. He negatived its existence when questioned at the family meeting.

   (e) The statement of claimant's account in book "A D," prepared by himself, increases, rather than removes, the suspicion and doubt and uncertainty surrounding his claim.

5. In any event, Faust had no right to appropriate to the payment of his claim the succession funds, which he had received in a fiduciary capacity. Hancock vs. Citizens Bank, 32 An. 592.

   Faust was not a partner and neither possessed nor claimed the right of a liquidating partner. Halliday vs. Bridewell, 36 An. 238.

6. The claim of Faust was barred by the prescription of three years. Colley vs. Latourette, 7 An. 222.

*Harry H. Hall* for Defendant and Appellee:

1. The issue herein is chiefly one of fact. Plaintiff's ancestor, to evade his creditors, placed his entire business property in the name and control of defendant, who administered it continuously for seventeen years, as its apparent owner. The real owner forbade the keeping of books or of accounts, lest they might disclose his ownership. Upon his death, defendant promptly surrendered all this property to decedent's heirs and presented a detailed account, made from memoranda and check books kept by him, and which account showed a balance due to him for services under an agreed rate of compensation.

2. In such a claim there can be no question of staleness, so long as the owner did not call upon his mandatary for an account. No obligation rested upon the mandatary to demand a settlement, especially when he held property of his principal largely exceeding his claim. Civil Code, Arts. 3004, 3023.

3. The defendant does not rest alone upon his own testimony to support his claim. It is proven by many witnesses, and corroborated by many circumstances.

4. No prescription runs where the creditor holds the debtor's property.

The possession by its creditor of property for the purpose of being paid from the income of it is a standing acknowledgment, by the debtor, of his indebtedness. It prevents prescription from running in the same manner as in the case of a pledge; prescription does not run so long as the thing pledged remains in the possession of the pledgee.

Every successive payment, moreover, made out of the income of defendant's property operates as an interruption of prescription. *Vide* Montgomery vs. Levistone, 8 Rob., p. 147; 1 Rob. 556; C. C. 3461; 21 An. 130; 22 An. 107.

5. Defendant was, assuming his claim to be just, authorized by consent of plaintiff's legal adviser to pay himself; he was also authorized to do so by reason of his position as liquidating partner and mandatary making consent liquidation. He did not use succession funds, but paid himself from the funds arising from the liquidation of the business, and in which the succession only had a residuary interest. And this question is not vital, since the funds are deposited subject to the order of the court.

6. The facts of the instant cause are not similar to those of Halliday vs. Brideway, 36 An. 238, but bring it within the decision of Radovich vs. Frigerio, 27 An. 69, and create a partnership.

But whether there was or was not a partnership is immaterial, since the money is held subject to the order of court.

---

The opinion of the court was delivered by

FENNER, J.   The controversy in this case arises out of the following facts:

William C. Faust was the son-in-law of the decedent, Frank Borge.

In 1872 and 1874 Borge became the purchaser of a certain business, known as the New Orleans Transfer Company, and of the property engaged therein, consisting of coaches, wagons, horses, harness, office furniture, fixtures, etc.   The purchases, however, were made

by Borge through and in the name of William C. Faust, who alone appears as actor in the transaction, who paid the cash portion of the price and who gave his individual notes for the deferred payments, all of which appears from the notarial acts of sale extant on the record.

Borge was not known in the transaction, and was obviously solicitous of concealing his interest therein. His reason, as indicated by the testimony, was the embarrassed condition of his personal financial affairs. He took no counter-letter. The business was conducted entirely in the name, and for the apparent account, of Faust. Regular books were kept of the transfer business, which was a very lucrative one. At the end of each month these books were balanced, the net earnings were ascertained, and the amount thereof was paid over to Faust, who passed them to his individual credit in bank. These funds were disbursed by Faust either to Borge, personally, or by his orders, or for his account. From 1875 to 1885 Faust worked for a salary. After the 1st of January, 1885, Borge allowed him an interest of one-fourth the net earnings. As Faust figured in the transfer business as sole owner and received the whole earnings, of course, the account of his salary and interest makes no appearance on the books of the transfer. And as Borge did not appear in the business at all, the books are equally silent as to him. All the accounts of Faust's salary and interest, as well as of all payments between him and Borge, are outside of the books of the transfer, and are involved in the settlement of the account between the two touching the funds realized as net profits of the business and paid over to Faust, as apparent owner. Faust drew on account of the salary and share of profits due him as he saw fit, and he made payments to Borge, or for his account, as directed. Borge forbade him to keep any regular accounts of the dealings between them, assigning, as a reason, that their production might show his ownership of the business, which he desired to conceal. Therefore, Faust's accounts were kept solely in the shape of checks and private memoranda.

This account remained entirely open and unsettled during the whole lifetime of Borge, who died in March, 1889. It does not appear that Borge, at any time, ever demanded any account or settlement whatever. We have rarely encountered an instance of such unlimited confidence reposed by one person in another. Borge

placed the legal title to his business and property in the name of Faust without a counter-letter.   He placed the large revenues of the business in the possession and absolute control of Faust, entrusting him with their custody and disbursement, never exacting an account from him and even forbidding him from keeping any regular books of the account.

As late as March, 1888, Borge placed in the name of Faust two pieces of real estate which he owned and used in the transfer business, without requiring a counter-letter.

In the meantime Borge's daughter, the wife of Faust, had died; and in September, 1888, Faust was about to contract a second marriage.   At that time, and in view of that fact, two counter-letters were executed on September 26, 1888, one acknowledging Borge's ownership of the real estate just referred to, and the other acknowledging his ownership of the transfer business and property.   The last was executed in duplicate, and one was left in the possession of Borge and the other in that of Faust.   Even after this, Borge returned to Faust his copy and told him to destroy it; but Faust, after consulting with Borge's confidential attorney, on his advice, determined not to destroy it.

In the latter part of 1888, Borge's state of health portended a speedy dissolution, and rumors reached Faust's ears that the widow and heirs would require of him a strict accounting.

Then for the first time, Faust undertook the task of compiling from his check books and memoranda a statement of his receipts and expenditures of moneys for account of Borge during the long period of time covered by their peculiar relations.   This statement was not concluded until shortly after the death of Borge.   The statement is contained in a book and includes many separate accounts. We find in it an itemized statement of the monthly profits of the transfer business which were passed to his individual credit, and which, in absence of any suggestion to the contrary, we assume is correct and corresponds with the transfer books.

We find a long itemized statement of all moneys paid to or for the personal account of Frank Borge, covering many pages and aggregating a sum of $87,257.   Also a like itemized statement of Faust's personal account, showing all moneys drawn by him against his salary and interest in profits from the beginning to the end of his employment, and crediting him with salary for the first ten years at the

rate of $1500 per annum and with interest of one-fourth of the profits after 1884. The account is closed by a balance struck in his favor of $5000 as due to him at the date of Borge's death.

The succession of Borge was opened, and the above book containing Faust's account and showing the balance due was handed to the attorney of the widow and heirs shortly after Borge's death.

An arrangement was effected between Faust and the widow and heirs by which the transfer business was continued for account of the widow and heirs, with Faust as manager at a salary of $250 per month. In that capacity he not only conducted the new business, in which he was employed only at a salary, but liquidated the old, in which he had an interest of one-fourth in the earnings.

At the instance of the administering tutor of minor heirs, an expert was employed to investigate the books of the transfer business. This expert swears that he was expressly charged to examine into the accounts of Faust, but this is denied. At all events, he received not only the transfer books, but also the book containing Faust's statement of the account between himself and Borge, and seems to have acted under the belief that it was his duty to examine and report upon the whole. Accordingly, he formulated and presented to the attorney of the widow and heirs a report which, besides other matters, included and approved Faust's account and the balance due him. The widow and heirs claim that, in this respect, the expert exceeded his authority, and the report was never filed. When offered in evidence in this case, it was objected to and excluded by the court, to which ruling a bill of exceptions was reserved and the report is brought up as part thereof. We think it should have been admitted, to prove *rem ipsam* that such a report was made; but the matter is of trifling consequence, as the testimony of the expert attesting that fact is in the record.

After this examination and report by an expert selected by the widow and heirs, Faust considered that he had the right to pay himself out of the collections made under his management of the transfer business. He consulted his attorney, who advised him that if the money was due to him, he had the right to pay himself, but not to act without informing opposite counsel. He then mentioned the subject to the attorney of the widow and heirs, who seem to have stated generally that if the money was due to him, he should be paid. Faust drew out the money. This the widow and heirs

strenuously objected to.  Upon notice of this objection, Faust's counsel met the attorney of the widow and heirs and an agreement was reached by which Faust made a special deposit of the $5000 in bank, to be held subject to the joint order of the two attorneys.

Thereupon the administering tutor took a rule upon Faust to show cause why the said fund should not be forthwith paid over to the succession of Borge, on two grounds, viz.: 1. That even if the debt claimed by Faust were due, it formed no justification in law for the retention of the funds which had been collected by him in a fiduciary capacity, and which he was bound to pay over to the succession.   2. That the debt claimed was not due.

No objection was made to the form of proceeding, and Faust filed an answer squarely joining issue on both grounds of the rule.

I

It is evident there were two distinct businesses requiring separate settlements, viz.: 1. The business of the Transfer Company down to the death of Borge, in which Faust had an interest of one–fourth in the profits; 2. The business after the death, which, by agreement, was conducted for the exclusive benefit of the widow and heirs, Faust managing the same only as a salaried employee.

We have critically examined the agreement between Faust and the widow and heirs, and it certainly seems to us to relate exclusively to the future business.   Whether Faust was a technical partner or not in the old business, he was its manager, entitled to one-fourth of the profits, and had the right to have it liquidated in order that his interest might be ascertained and settled. He charged himself with its liquidation, collected its credits and paid its debts, with the full knowledge and approval of the widow and heirs, and, conceding the debt claimed by him to be due, we think he had the same right to pay it from the collections of that business as to pay any other debt.   This matter, however, is of slight consequence. The succession is abundantly solvent; the fund in controversy is intact and secure; the question of debt *vel non* is fairly at issue and has been the subject of exhaustive evidence; and it is the interest of all that it should be now disposed of.

II

The facts of this case as we have detailed them are anomalous and peculiar.   Faust can not be charged with *laches* in suffering the

accounts between him and Borge to remain unsettled down to the day of the latter's death. Borge never demanded any account and the evidence shows that he never desired one, and even objected to such an account being kept.

The suggestion that he waited until Borge's death and then rendered an account which nobody but Borge could contradict, thus loses all force. If Borge chose that matters should be left in this shape, it does not lie in the mouths of his widow and heirs to complain or claim any advantage from it.

If Borge's confidence in Faust was such that he intrusted him with uncontrolled powers, dispensed with all checks and safeguards, exacted no accounting, and left him at the end to make up his accounts according to his own conscience, the widow and heirs must abide by the result, unless they can prove unfaithfulness or fraud.

Faust has rendered an elaborate and itemized statement of his dealings, presenting a full statement of all sums received by him and how they were disbursed.

These accounts, together with the books of the Transfer Company and Faust's check books, etc., have been in the possession, or under the control, of adverse parties, and they have had ample opportunity to examine and investigate them. In all the evidence in the case, we do not discover a suggestion that Faust ever received a dollar more than is shown in his statement, or that the disbursements reported by him do not cover the whole amount received. Neither do we discover any question made as to the correctness of any single item of the disbursements reported.

Indeed, the only item in the whole of Faust's accounts upon which any attack is made is the entry crediting himself with $15,000, as the amount of his salary during the first ten years of his agency.

Now, it is evident that in making up his individual account, covering the whole period of his employment, and purporting to charge himself with all that he received for himself, and crediting himself with all that was due to him, an entry of the amount due for his salary during the first ten years was a necessary and proper entry. The only question that could possibly arise is whether the amount so entered is the true and correct amount. The evidence, not only of Faust himself, but of several other disinterested witnesses, who learned the fact from Borge, establishes incontestably

that his salary was $1500 per annum, and this is corroborated by every fact in the case.

The correctness of this entry being thus fixed, the 'resulting balance in his favor can not be disputed, unless other entries in the account are falsified. This has not been done by any evidence, but plaintiffs invoke certain legal presumptions to throw discredit on the account.

It appears that the balance claimed as due results entirely from Faust's having drawn less than his salary during the first ten years of his employment. From this fact, the charge is made that the claim is a *stale* demand. Under the facts of this case, such a charge has no basis. The whole fund out of which Faust was entitled to be paid was in his own hands. What he did not draw he held in his own name and under his own control. It passed into the general account between him and Borge, which he was not required to render until it was demanded; and in now rendering his account, his assertion of his claim, as a resulting balance of the whole, is timely and free from any taint of staleness. The same considerations destroy the plea of prescription. Much stress is laid upon the improbability that Faust should have drawn so small a part of his salary during these years. We admit that, *prima facie*, it is improbable; but it is explained, and while the explanation is not absolutely satisfactory, it is plausible, and leaves the presumption too weak to support judicial action.

The ingenious counsel for plaintiffs refer to other circumstances, giving rise to adverse presumptions and discrediting Faust's claim. We have considered them very carefully, and, while not unimpressed, we can find in them nothing of sufficient strength to justify us in reversing the conclusions of the District Judge and in stamping, as a thief and a cheat, a man whose character is not otherwise impeached, who enjoyed the unlimited confidence of Borge, and who is further accredited by the trust which the parties assailing him have continued to repose in him.

In the language of Mr. Greenleaf, presumptions of this kind " are, in truth, but mere arguments, of which the major premise is not a rule of law; they belong equally to each and every subject-matter, and are to be judged by the common and received tests of the truth of propositions and the validity of arguments. They depend upon their own natural force and efficacy in generating belief or conviction

in the mind, as derived from those connections which are shown by experience, irrespective of any legal relations. They differ from presumptions of law in this essential respect, that while those are reduced to fixed rules and constitute a branch of the particular system of jurisprudence to which they belong, these merely natural presumptions are derived wholly and directly from the circumstances of the particular case, by means of the common experience of mankind without the aid or control of any rules of law whatever." 1 Greenleaf Ev., Sec. 44; Best on Ev., Sec. 316, *et seq*.

Cases do unquestionably arise in which such presumptions control the mind with such power of conviction as to undermine and destroy the effect of positive evidence to the contrary. Instances are presented in the cases quoted by appellants. Quock Ting vs. United States, 140 U. S. 420; Wood vs. Egan, 39 An. 684; Cutter vs. Collins, 37 An. 95.

Slight variations in the facts of any particular case alter the force of such presumptions, and inflexible rules can not be prescribed for their application.

Considering all the facts of this peculiar case together, we find no sufficient reason to disturb the conclusion reached by the District Judge except in one respect. Faust's own testimony leaves us unsatisfied as to whether his salary of $125 per month began on the 1st of January or 1st of July, 1875. Up to the 1st of July, 1875, he was engaged in the warehouse business on his own account, and only kept the books of the Transfer Company. He himself says:

"I continued the warehouse business for my own account until July, 1875. From January, 1875, to July, 1875, I kept the Transfer Company's books. Then, as Borge said it did not look well for me to be in the warehouse business, as I had the transfer business in my name, I went to work in the transfer business for $125 a month."

He was doubtless entitled to something for prior services, but his salary of $125 a month is only shown to have begun in July. A reduction of $500 in the amount allowed him will do justice.

It is, therefore, adjudged and decreed that the judgment appealed from be amended by reducing the amount allowed in favor of Faust from $5000 to $4500, and by ordering the difference to be paid over to plaintiffs in rule, and that, as thus amended, the judgment be now affirmed, appellees to pay costs of appeal.